# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

LISA SCOTT BOWERS,

                **Plaintiff,**

-vs-                                   **Case No.  6:04-cv-1442-Orl-31KRS**

JAMES T. DREW, T. JONES, J. CANADA,
and ORANGE COUNTY, FLORIDA,

                **Defendants.**

_____

# ORDER

This matter comes before the Court on the motions for summary judgment filed by Defendants James Drew ("Drew"), T. Jones ("Jones"), and J. Canada ("Canada") (collectively, the "Individual Defendants") (Doc. 22) and Orange County, Florida (the "County") (Doc. 21), as well as the memorandum in opposition (Doc. 28) filed by the Plaintiff, Lisa Scott Bowers ("Bowers").[1]

## I.  Background[2]

Bowers was arrested on June 8, 2003 and booked into the Orange County Jail (the "Jail") at approximately 10:40 a.m.  Bowers informed Jail medical staff that she had been taking Xanax

_____

[1]It is not clear whether Bowers' memorandum in opposition was intended to respond to both summary judgment motions or only the one filed by the Individual Defendants.  Both motions were filed on the same day.  In her memorandum, Bowers states her opposition to "the Defendants' Motion" and specifically addresses the actions of Defendant Drew, suggesting she was responding only to the motion filed by the Individual Defendants.  If such is the case, then Bowers missed the deadline for responding to the County's motion for summary judgment.  This Court's Milburn Order set March 3, 2006 as the deadline for responses to either summary judgment motion.  (Doc. 25 at 1).

[2]The facts in this section are drawn from Bowers' Amended Complaint (Doc. 13) and the "Statement of Material Undisputed Facts" section found in both of the summary judgment motions, with which Bowers did not disagree in her response.

three times a day to treat chronic depression and anxiety for an extended period of time, and that she had taken her last dose the previous day.[3]  Bowers was not permitted to take Xanax while she was incarcerated.  At approximately 6:45 p.m. on June 10, 2003, Bowers was transferred from the general booking area of the Jail to the female detention center.  About five minutes later, Bowers suffered a seizure.

Bowers filed suit under 42 U.S.C. § 1983  in state court, alleging that Jail personnel had subjected her to cruel and unusual punishment by withholding her medication. (Doc. 3).  On September 30, 2004, the Defendants removed the case to this Court.  (Doc. 2).  On November 1, 2004, Bowers filed an amended complaint (Doc. 13), alleging violations of the Eighth Amendment by the Individual Defendants (Count I) and by the County (Count II).

## II.    Standards

### A.    Summary Judgment

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  Whether a fact is material depends on the substantive law of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  If there is an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof, that party must "go beyond the pleadings and by . . . affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine

---

[3]In her amended complaint, Bowers contends she had been taking Xanax daily for four years, but it is not clear that she told the Jail medical staff how long she had been taking it.

issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and

citation omitted).  Summary judgment is mandated against the non-moving party who thereafter

fails to present sufficient evidence to establish a genuine issue of fact for trial.  *Id.* at 322, 324-25.

In this review, the Court must consider all inferences drawn from the underlying facts in a

light most favorable to the non-moving party, and resolve all reasonable doubts against the moving

party.  *Anderson*, 477 U.S. at 255.  If an issue of material fact exists, the court must not decide it,

but rather, must deny summary judgment and proceed to trial.  *Environmental Def. Fund v. Marsh*,

651 F.2d 983, 991 (5th Cir. 1981).[4]

> **B.**      **Section 1983 and Qualified Immunity**

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage
> of any State ... subjects, or causes to be subjected, any citizen of the United States ...
> to the deprivation of any rights, privileges, or immunities secured by the Constitution
> and laws, shall be liable to the party injured in an action at law [or] suit in equity. . . .

42 U.S.C. § 1983.

Qualified immunity shields a Section 1983 defendant from liability for harms arising from

discretionary acts, as long as the discretionary acts do not violate clearly established federal

statutory or constitutional rights of which a reasonable person would have known.  *Wilson v.*

*Jones*, 251 F.3d 1340, 1344 (11th Cir. 2001).  To receive qualified immunity, "the government

official must first prove that he was acting within [the scope of] his discretionary authority."

*Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003).  Once the official establishes that he was

---

[4]All decisions of the Fifth Circuit prior to October 1, 1981 are binding precedent on this Court.
*Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

acting within the scope of his discretionary authority, the burden shifts to the plaintiffs to show that qualified immunity is not appropriate. *Id*. To determine whether qualified immunity is appropriate, the Court must ask two questions. First, whether, viewed in the "light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id*. (internal citation and quotation omitted). Second, if a violation of a right can be made out based on the facts alleged, the Court must determine whether that right was clearly established. *Id*. In making these determinations, the Court accepts "all well-pleaded facts in the complaint as true and draw[s] all inferences in the plaintiff's favor." *Williams v. Ala. State Univ.*, 102 F.3d 1179, 1182 (11th Cir. 1997); *see also O'Rourke v. Hayes*, 378 F.3d 1201, 1206 (11th Cir. 2004) (the Court "look[s] to the pleadings to see if the plaintiff has successfully alleged the violation of a clearly established right.").

The determination of whether a constitutional right was clearly established at the time of the incident must be made in the specific context of the case. *Vinyard v. Wilson*, 311 F.3d 1340, 1349 (11th Cir. 2002). "A right is clearly established if, in light of preexisting law, the unlawfulness of the official's conduct is 'apparent'." *Cooper v. Dillon*, 403 F.3d 1208, 1220 (11th Cir. 2005); *Vinyard*, 311 F.3d at 1350 (issue is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."). This standard does not require that the particular conduct under scrutiny was previously found to be unlawful. *Cooper*, 403 F.3d at 1220. Instead, the state of the existing law must only be such that the official had a fair warning that his conduct is unlawful. *Id*. *See also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law

forbade conduct not previously identified as unlawful.").  General statements of the law are not inherently incapable of giving fair and clear warning, and in some instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful.  *Hope v. Pelzer*, 536 U.S. 730,. 741 (2002) (internal quotation omitted).

The Eleventh Circuit has identified three categories of "fair and clear" warning:

> First, we look to see whether the federal statute or constitutional provision is so clear, and the conduct is so bad, that it precludes qualified immunity even in the total absence of case law.  Second, if the conduct is not bad enough that it violates a constitutional provision on its face, we look to case law that can be applied broadly to a number of factual situations. Third, and finally, if no broad case law is applicable, we turn to case law precedent that is tied to the facts.

*Kesinger v. Herrington*, 381 F.3d 1243, 1250 n.6 (11th Cir. 2004) (internal citations omitted).

## C.  Deliberate Indifference

A government official's treatment of a pre-trial detainee is governed by the Due Process Clause of the Fourteenth Amendment, while the Cruel and Unusual Punishment Clause of the Eighth Amendment governs an official's treatment of a convicted prisoner.  *Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1425 n.6 (11th Cir. 1997).  The minimum standard for providing medical care to a pre-trial detainee under the Fourteenth Amendment is the same as the minimum standard required by the Eighth Amendment for a convicted prisoner – both the right to due process and the right to be free from cruel and unusual punishment are violated by a government official's deliberate indifference to serious medical needs.  *Id.*  Such indifference can be manifested by prison doctors taking the easier and less efficacious rout in treating an inmate, by guards delaying or denying access to medical care or intentionally interfering with treatment once

prescribed, or by medical treatment that is so "grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986).  However, mere negligence or malpractice does not violate the Eighth Amendment.  *Id.*

Within this Circuit, it is clearly established that a jail official acts with deliberate indifference "when he knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate." *Lancaster* at 1425.  Similarly, it is clearly established that an official acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening condition that would be exacerbated by delay.  *Id.*

**III.    Analysis**

The parties agree that Xanax, which is part of a class of drugs called benzodiazepines, can cause seizures when a patient abruptly stops taking it.  Bowers contends that, despite knowing that she was on a "high amount" of Xanax and that "withdrawal from Xanax causes seizures," the Defendants demonstrated deliberate indifference to her medical needs by failing to take any steps to prevent the occurrence of such seizures.  (Doc. 28 at 6-7).  The County argues that Bowers has produced no evidence that this alleged failure occurred as a result of a official policy or custom, as required to establish Section 1983 liability against a governmental entity.  (Doc. 21 at 12-20). *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  In her response (Doc. 28), Bowers does not even argue that such a policy or custom existed, much less point to any evidence of it. The County is therefore entitled to summary judgment.

In her amended complaint, Bowers accuses the three Individual Defendants of showing a "cruel and deliberate indifference" to her medical condition by "intention[ally] withholding [her] medication." (Doc. 13 at 3). Defendants Jones and Canada – both nurses at the Jail – argue that there is no evidence that they withheld anything from Bowers or engaged in any other conduct that might have violated her constitutional rights. (Doc. 22 at 17-19). According to Canada, she saw Bowers only once, when she performed a withdrawal assessment at 2:00 a.m. on June 9, 2003. (Doc. 22 at 9). Canada argues that no doctor had prescribed Xanax or any other benzodiazepine for Bowers and Canada did not have the authority to do so on her own. (Doc. 22 at 18-19). Jones contends that her only involvement in Bowers' care consisted of writing orders from a mental health specialist into Bowers' medical chart. (Doc. 22 at 9). Both Jones (Doc. 24-6) and Canada (Doc. 24-4) have provided affidavits in support of these contentions. Bowers' memorandum in response (Doc. 28) does not mention Jones at all, mentions Canada only in passing,[5] and fails to address either Defendant's argument about their lack of participation in any alleged constitutional violations. The Court therefore finds that Canada and Jones are entitled to summary judgment.

And thus the only remaining defendant is Dr. Drew, who denies that he and the Jail staff displayed deliberate indifference toward Bowers' medical needs. Dr. Drew points out the

---

[5]In the response, Bowers mentions Canada only to highlight two excerpts from her deposition: first, that while working as a nurse in the jail, Canada would see inmates suffer withdrawal seizures on a "pretty routine basis, either work [sic] weekly or monthly," and second, that after the Jail pharmacy stopped distributing Xanax to patients, the drug "was still distributed to patients if brought in by families". (Doc. 28 at 3). Canada's deposition transcript has not been made a part of the record, and therefore the Court cannot verify the accuracy of Bowers' description of this testimony. Even if both excerpts are accurate, however, neither suggests that Canada displayed deliberate indifference to Bowers' medical condition.

following facts, none of which were disputed by Bowers in her response to the motion for summary judgment:

• During the period at issue in this suit, the Jail had extensive medical policies and procedures in place governing, among other things, distribution of medication to inmates and treatment of inmates experiencing benzodiazepine withdrawal.

• Dr. Drew never saw Bowers.  All information regarding her condition was relayed to him by Jail personnel.

• Bowers received a medical screening by a medical assistant within two hours of her arrest.

• Dr. Drew was notified that Bowers told the screener that she had been taking Xanax to treat anxiety and depression, and that he had hypertension.  Dr. Drew was also notified that Bowers' urine drug screen test had been negative for benzodiazepines.[6]

• In response to the information received by Dr. Drew, he ordered that Bowers be evaluated by a mental health specialist and that she remain in the central booking unit until this evaluation had been accomplished.  He also ordered that she undergo an assessment once each eight-hour shift for signs of drug withdrawal, with instructions to call him if her "withdrawal score" exceeded

_____

[6]In his affidavit, Dr. Drew states that, in his experience as a physician, it is not uncommon for patients to be untruthful about their drug use.  (Doc. 24-2 at 5).  He also says that if he had been told that Bowers had tested positive for benzodiazepines, he would have followed the Jail's policy by placing her on a "benzodiazepine withdrawal protocol."  (Doc. 24-2 at 4).  This protocol would have included giving Bowers gradually diminishing doses of a different benzodiazepine – Ativan – over the course of two weeks.  (Doc. 24-2 at 4).

five.[7]  He also prescribed Atenolol 50 milligrams once a day for five days, placed her on a cardiac diet, and ordered that her blood pressure be monitored for five days, with instructions to call him if it exceeded 150/90.

• Bowers refused to take the Atenolol, which had been prescribed for her elevated blood pressure.

• Jail medical staff assessed Bowers for signs of drug withdrawal at 11:55 a.m. and 6:00 p.m. on June 8, at 2:00 a.m., 10:40 a.m. and 7:30 p.m. on June 9, and at 2:30 a.m. and 9:30 a.m. on June 10.  On each occasion, her withdrawal assessment score was two or less.

• During the 6:00 p.m. assessment on June 8, Bowers indicated she was experiencing increased anxiety, and her blood pressure was 160/97.  In response, Jail staff contacted Dr. Drew, who prescribed Vistaril.  The Vistaril was given to Bowers at 6:15 p.m. that night, and again at 8:00 a.m the next day.

• Per Dr. Drew's orders, a mental health specialist performed an assessment on Bowers on June 9, 2003.  The mental health specialist ordered that the mental health observations be discontinued, scheduled her for mental health sick call and referred her to the corrections psychiatrist.

Thus, over the course of three days, Bowers underwent assessment by various members of the Jail's medical staff at least nine times.  And when Bowers appeared to be experiencing increased anxiety, Dr. Drew was promptly contacted and promptly prescribed additional

---

[7]Neither party explains the elements of such a withdrawal assessment, but based on the description in the parties' papers, it appears to consist of monitoring of blood pressure, temperature, respiration, and pulse rate, as well as review for behaviors such as trembling, with unusual results leading to an increased "withdrawal score."

medication.  Though certainly not dispositive of the issue, the foregoing evidence contradicts any suggestion that Dr. Drew and the Jail personnel were deliberately indifferent to Bowers' medical needs.

The Defendants have also presented expert opinions from physicians who have reviewed Bowers' allegations, medical records, and testimony, as well as the Jail records regarding Bowers' treatment and the Jail medical policies in place during her incarceration.  Dr. Jeffrey Danziger – primarily a damages expert – opined that, in light of the negative drug screen, Dr. Drew's strategy of watching for possible seizures and treating them if they began to occur did not amount to deliberately ignoring or being indifferent to the possibility of such an occurrence.  (Doc. 23-2 at 4). Dr. Joseph Smyth, medical director for the Volusia County Department of Corrections for more than twelve years, offered his opinion that the Jail had appropriate medical policies in place, that Dr. Drew acted appropriately given the information as he knew it, and that his actions did not demonstrate deliberate indifference to Bowers' medical needs.  (Doc. 23-4 at 3-9).  Bowers offers no expert testimony to contradict (or even respond) to the affidavits and reports from Dr. Danziger and Dr. Smyth.

Bowers argues that a genuine issue of material fact exists as to whether she was given a urine drug screen when she first arrived at the jail.  (Doc. 28 at 1).  In support, she points to 1.) her own testimony that she never gave a urine sample at the jail and 2.) a positive benzodiazepine test performed at the Orlando Regional Medical Center ("ORMC") after she suffered the seizure. (Doc. 28 at 1-2).  Unfortunately, neither her deposition nor the ORMC records have been made a part of the record in this case, and thus neither can provide evidentiary support for Bowers' argument.

Even if those documents were found to say what she claims they say, and even if that evidence were sufficient to raise a genuine issue of material fact, it would not be enough to avoid the entry summary judgment in favor of Dr. Drew. Regardless of whether the drug test was actually performed upon her arrest, Bowers does not dispute that Dr. Drew was informed that she had tested negative and that he based his course of treatment on that information.  (Doc. 24-2 at 4). In the absence of evidence that Dr. Drew knew or should have known that Bowers had benzodiazepines in her system when she was arrested, no reasonable jury could find that he committed malpractice, much less that he was deliberately indifferent to Bowers' medical needs, by declining to provide her with such drugs.[8]

## IV.   Conclusion

For the foregoing reasons, the motions for summary judgment filed by Defendants James T. Drew, T. Jones, and J. Canada (Doc. 22) and Orange County, Florida (Doc. 21) are **GRANTED.**  The Clerk is directed to enter judgment for the Defendants and close the case.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on March 29, 2006.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

---

[8]Bowers has also failed to present any evidence that Dr. Drew's decision to watch for withdrawal symptoms and treat them if they occurred was inappropriate even for a detainee known to have benzodiazepines in her system.  Unlike the situation in the cases relied on by Bowers, there is no showing here that someone suffering benzodiazepine withdrawal is certain or almost certain to suffer seizures or other serious medical consequences – at least not before their situation could be recognized and treated by Jail medical personnel.  *Compare Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1422 (11th Cir. 1997) (finding that sheriff knew victim, a chronic alcoholic who had been arrested for a DUI, "would have a seizure in eight to ten hours if he did not get alcohol or medicine" and that his last such seizure "had almost killed him.").

-11-